UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| Eugene Kuzinski, Marc Campano, Jerry Harris, and Shawn Jones on behalf of themselves and others similarly situated,<br>    *Plaintiffs*,<br><br>    *v.*<br><br>Schering Corporation,<br>    *Defendant*. | Civil No. 3:07cv233 (JBA)<br><br><br><br><br>March 30, 2009 |

**RULING ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT [Doc. # 85]**

Plaintiffs Eugene Kuzinski, Marc Campano, Jerry Harris, and Shawn Jones (collectively, "Plaintiffs") initiated this suit against Schering Corporation ("Schering" or "Defendant"), their former employer, for relief from Defendant's alleged misclassification of them as "exempt" employees resulting in its failure to pay them overtime wages, in violation of the Fair Labor Standards Act (FLSA), 29 U.S.C. §§ 201 *et seq.* Defendant has moved for summary judgment on the ground that Plaintiffs fall within the FLSA's outside sales exemption. For the reasons set forth below, Defendant's motion for summary judgment is denied.

I.      **Factual Background**

Schering manufactures and "sells prescription drugs to hospitals, certain managed care organizations, wholesale distributors and retail pharmacists." (Schering-Plough Corporation Form 10-K for Fiscal Year Ended Dec. 31, 2007, Ex. 1 to DiChiara 1st Decl. [Doc. # 97], at 18.) It employs sales representatives—alternately called Pharmaceutical Sales

Representatives, Professional Sales Representatives, and Sales Representatives, to which positions the Court refers, collectively, as pharmaceutical sales representative ("PSR")—through whom it "introduces and makes known its prescription drugs to physicians, pharmacists, hospitals, managed care organizations and buying groups." (*Id.*) Schering previously employed each Plaintiff as a PSR.[1]  According to Joseph DeFeo, Schering's Senior Director of Global Pharmaceutical Business Finance, PSRs are not responsible for promoting any Schering product that "can be sold without the use of a physicians prescription."  (DeFeo Dep. at 55:10–14.)

Schering distributes its products to several entities: the bulk—"over 90 percent"—go to wholesalers, and the remainder go to governmental entities, hospitals, and directly to chain pharmacies.[2]  According to DeFeo, wholesalers negotiate "inventory management agreements," which limit their inventory levels and set prices on Schering's products, with the "trade organization" and "legal team" operating under Schering's managed markets group.  (DeFeo Dep. at 37:4–38:14; *see also* Abrahamsen Dep. at 47:7–23 (stating that

---

[1] Kuzinski 1st Decl. [Doc. # 96] at ¶ 2 (noting employment with Schering ended March 2006); Campano 1st Decl. [Doc. # 94] at ¶ 2 (noting employment with Schering ended July 2004); Harris 1st Decl., Ex. C to DiChiara 2d Decl. [Doc. # 103], at ¶ 2 (noting employment with Schering ended December 2006); Jones 1st Decl. [Doc. # 95] at ¶ 2 (noting employment with Schering ended September 2004).

[2] (DeFeo Dep. at 30:21–31:18 & 32:7–21 & 34:5–6.)  DeFeo also testified that "[i]f there is an emergency order for a product that can't make its way through the supply chain of the pharmaceuticals, . . . then the sale might be direct to . . . maybe even a physician," who would purchase them though "a group purchasing organization" through which the physician would "receive the product directly but . . . not directly pay[] for it."  (DeFeo Dep. at 32:11–33:2.)

managed markets group negotiates contracts.)  A wholesaler may only negotiate the "price and quantity [of Schering products] supplied" when negotiating its inventory management agreements, and not with PSRs.  Once an agreement is in place, under which a "wholesaler . . . submit[s] an order though [Schering's] customer service group," that group fills the order after confirming that doing so would not leave the wholesaler with more of any product than is allowed under its inventory management agreement.  (DeFeo Dep. at 37:4–22; *see also* Abrahamsen Dep. at 47:24–48:2 (stating that PSRs are not part of managed markets group).)  PSRs are not "involved at all in reviewing the orders that come from wholesalers."  (DeFeo Dep. at 39:18–21.)

Towards the end of each fiscal quarter, Schering's "customer service organization tracks shipments" and Schering "work[s] with our wholesalers to adjust the date the order may come in, to insure that it will get there on time," because the company records revenue when its product has been received by the wholesaler "purchasers."  (DeFeo Dep. at 36:2–24.)  Thus, Schering does not "record income when a health care provider tells a [PSR] that he or she will consider using a Schering product or prescribing a Schering product," or "promises a [PSR] that [he or she] will prescribe a Schering product," or "commits to a [PSR] that [he or she] will prescribe a Schering product," or writes a prescription for a Schering product.  (DeFeo Dep. at 45:21–47:1.)  It also does not record income when the "health care provider hands a prescription to a patient," or when the "prescription is filled at a pharmacy," or "when a patient pays for a prescription at a pharmacy," or when "an insurance

company reimburses a pharmacy for a prescription for a Schering product that is filled by

a patient," or "when a [PSR] provides samples to a health care provider." (DeFeo Dep. at

47:2–20.) Instead, as the company has explained, it "recognizes revenue when title and risk

of loss pass to the purchaser and when reliable estimates" of sales returns and the effects of

discount and rebate arrangements and obligations "can be determined." (Schering-Plough

Corporation Form 10-K for Fiscal Year Ended Dec. 31, 2007, at 117.)

Nonetheless, Schering's revenue for its prescription pharmaceuticals business

depends on the use of its products by patients, which it turns requires physicians to prescribe

its products. A physician's prescription-writing practices and Schering's sales are related in

"a ripple effect up the supply chain," such that if physicians were to write fewer prescriptions

or patients were to stop filling prescriptions written for Schering products, the demand for

its products would reduce and Schering would experience lower sales to its wholesalers,

whose inventory management agreements are designed to ensure that wholesalers'

inventories "be as closely related to patient demand as possible." (DeFeo 42:11–43:3 &

54:9–55:23 & 57:14–58:5.) At oral argument Schering explained that its "drugs have been

moving out the door because a patient showed up with a prescription from a physician who

was influenced to write that prescription based on the information he was provided by the

[PSR]." (Oral Arg. Tr. [Doc. # 125] at 6:18–7:17; *see also id.* at 15:23–17:20 & 40:13–41:15.)

To maintain or increase its market share, Schering promotes its products both

through the work of PSRs and through direct-to-consumer advertising campaigns. DeFeo

4

explained that direct-to-consumer campaigns drive expansions in the overall market for a type of pharmaceutical, and its PSRs' efforts "drive [Schering's] market share" for a given product.  (DeFeo Dep. at 24:3–25:19.)  Schering employs these promotional tools together with the expectation that their interaction will drive patient demand for its products, and thus increase its sales.  (Abrahamsen Dep. at 26:4–16; *see generally id.* at 25:7–28:19; *see also* Lowy Dep. at 16:2–19:25 (describing Schering's budget for direct-to-consumer advertising campaigns for various products); Ciaffoni Dep. at 90:12–18 (noting Schering's desire to "achieve an optimal mix" between direct-to-consumer advertising, other media advertising, and PSRs' work).)

Each Plaintiff declares that as a PSR his "core job responsibility was to meet with medical professionals in an assigned territory to provide them with Schering-approved and carefully scripted information and materials about Schering's pharmaceutical products" with the intent that this data would "encourage the medical professionals to make Schering products available to patients, such as by recommending or prescribing them."  Each Plaintiff worked away from Schering's offices throughout the day, visiting physicians, taking health care professionals to lunch or dinner at which they would promote Schering's products, and attending after-hours Schering training sessions and conferences with other Schering PSRs.  Each Plaintiff reported to a District Manager, who supervised Plaintiff's work and sometimes observed Plaintiff's fieldwork during "ridealongs."  PSRs may not "relay any information to a health care provider other than what's been provided to them through

training" by Schering, and may present only "preapproved clinical stud[ies]."[3]  Schering

purchases data about physicians' prescriptions, which it uses to "target" physicians—that is,

select the physicians to whom PSRs will promote Schering products—and to track trends in

the use of its products.  (Abrahamsen Dep. at 18:4–19:23 (discussing vendors of prescription

data); Kuzinski Dep. at 81:8–24 (explaining that he targeted physicians writing prescriptions

for the class of drug he promoted).)

Schering PSRs' primary responsibility is to develop relationships with physicians and

other health care professionals and deliver to them a "core message" about a particular

pharmaceutical product manufactured by their employer to physicians with the intent that

this message will persuade physicians to prescribe products made by Schering rather than

its competitors when their use is indicated.  (See Ciaffoni Dep. at 18:10–21:13 & 28:5–34:19

& 83:15–85:11.)  Before meeting with physicians PSRs create "pre-call plan[s]," which they

create primarily by reference to what they know about the physicians they visit and

Schering's up-to-date information about the product they promote.  They receive substantial

medical training from Schering, which they use in answering physicians' questions about the

---

[3] Kuzinski 2d Decl. ¶ 7 & 9–10; see also Jones 2d Decl. ¶ 7 & 9–10 (same), Harris 2d
Decl. ¶ 7 & 9–10 (same) & Campano 2d Decl. ¶ 7 & 9–10 (same), all at Ex. 9 to DiChiara 1st
Decl. [Doc. # 97]; see also Ciaffoni Dep. at 35:12–25 (describing ridealongs); Granowitz Dep.
at 36:3–33:10 (discussing limits on information presented by PSRs); Jones Dep. at 34:4–36:7
& 55:25–59:6 (describing ridealongs); Kuzinski Dep. at 100:22–101:25 (stating that he
communicated with his District Manager at least once per week, and that she did two-day
ridealongs with him once or twice per quarter); Harris Dep. at 29:11–32:2 (describing
training).

promoted product's indications, contraindications, effects, and other features. (*See id.*; Jones

Dep. at 30:19–34:3 (describing medical and skills training) & 71:18–74:12 (describing data

sources for pre-call plan).)

Sometimes PSRs begin their presentations with an "opening statement" about the

product to engage the physician; in all visits they "are expected and required to sell

[Schering] products within the approved promotional guidelines" and "are free to

communicate any approved information in line with the labeling of [Schering] products to

a physician," as provided to them by Schering. (Ciaffoni Dep. at 18:10–19:19 & 28:11–21 &

72:13–73:19.) Schering's Senior Director of Global Business Analytics, Glenn Abrahamsen,

explained PSRs' work, sometimes referred to as "detailing," as being "the conversation that

a [PSR] has with the physician during the engagement in that physician's office [during

which] the [PSR] is there selling the various aspects of the product to the physician,

answering the physician's questions and so on." (Abrahamsen Dep. at 79:16–24.)[4] PSRs also

understand that they are limited by regulations promulgated by the Food and Drug

Administration ("FDA") in what they can tell physicians about their products. (*See, e.g.*,

---

[4] At oral argument Schering stated that PSRs' "job is to tell the physician about the
attributes and any contraindications, the uses, the benefits of those drugs, and if the doctor
raises questions about a competitor, to respond to those and explain why the drugs are
different. They cannot say to the doctor, 'I can sell you Avelox for $5 a tablet' because
they're barred by law from doing that, but everything else they do is aimed at convincing the
physician that the right thing to do is to write a prescription for the appropriate patient
class." (Oral Arg. Tr. at 12:22–13:7.)

Jones Dep. at 46:22–47:17; Harris Dep. at 59:17–60:4.)  Plaintiffs' visits with physicians were very short; Jones testified that they lasted no longer than five minutes.  (Jones Dep. at 43:5–44:14.)

For their work Schering's PSRs earn, in addition to their base salary, incentive payments based, roughly, on the number of prescriptions for Schering products written in the geographic area over which they have jurisdiction.  "[D]irect links are [not] made" between a PSR's work and a physician's prescription for a Schering product (and, thus, to resultant increases in Schering's market share), and Schering does not establish a "a one-to-one relationship" between them.  Moreover, in many cases "[PSRs] work collaboratively" and in tandem with direct-to-consumer advertising campaigns, which makes specific attribution impossible.  Nonetheless, a Schering PSR earns commissions on the basis of "the number of prescriptions that are attributed to [her]" and where appropriate PSRs "share credit" for such prescriptions.  (Abrahamsen Dep. at 57:2–68:14 & 85:5–20; *see also* McDermott Dep. at 23:4–13 (stating that District Managers also receive incentive compensation) & 34:15–23 (discussing incentive and salary components of PSRs' compensation); Email from Carrie Cox Connect dated Dec. 23, 2004, Ex. B43 to Def.'s Mem. Supp. Mot. Summ. J. [Doc. # 86] (describing 2005 Incentive Compensation Plan for Schering PSRs).)  Schering classified Plaintiffs as exempt from FLSA's overtime pay requirements.

It is undisputed that both Schering and other companies in the pharmaceutical industry use the term "sales" to portray the work that PSRs do, and that that term permeates

both Schering's and its employees'—including Plaintiffs'—description of the work of promoting Schering's products.  Not only does Schering name the PSR position a sales position and consider its promotional activities "selling," but its advertisements seek individuals with sales skills and experience,[5] and it evaluates its PSRs "on their sales performance" and "on their selling skills."[6]  Plaintiffs also utilized the term "sales,"[7] and in fact, as their job descriptions indicate, they were each employed as "sales representatives."[8]

---

[5] *See, e.g.*, Job Advertisement; Job Level Description for Virology Sales Representatives and Sales Associates; Participant's Workbook (describing "The Schering-Plough Selling Process"), Exs. B9 & B14–B15 & B19–B20 to Def.'s Mem. Supp.

[6] McDermott Dep. at 17:23–18:3.

[7] *See, e.g.*, Campano Job Application (listing "Professional Sales Representation" as position sought); Harris Job Application (listing "Sales Representative" as position sought); Jones Job Application (listing "Sales – Hepatitis C" as position sought); Campano Resume (including objective as being continuation of "successful career as a Professional Pharmaceutical Sales Representative" and listing former employment as Schering PSR as including achievement of "maintenance and growth of market share"); Jones Resume (listing "Products Sold" while employed as "Pharmaceutical Specialist"); Harris Application Letter (noting his "firm grasp of advanced clinical sales technique and strong communication and marketing skills"), Exs. B3–B5 & B11–13 to Def.'s Mem. Supp.; *see also* Jones Dep. at 50:21–53:10 (noting that as a PSR for another pharmaceutical company Jones did not "actually sell, have in [his] hands, drugs from [the former employer] that the doctors bought from [him]" but described himself as performing sales because "I believed I was doing a good job of promoting the products" and sought a similar position with Schering).

[8] Offer Letter to Campano (hiring Campano as "Professional Sales Representative"); Offer Letter to Harris (hiring Harris as "Oncology/Biotech Sales Representative"); Offer Letter to Jones (hiring Jones as "Hepatitis Sales Representative"), Kuzinski Retirement Letter (noting retirement as "sales representative"), Exs. B31–33 & B36 to Def.'s Mem. Supp; *see also* Jones Dep. at 30:10–18 ("I was hired into Schering's sales force. . . . I do understand that Schering considered the job to be a sales position."); Kuzinski Dep. at 28:23–29:14 (noting that in a previous job "it was definitely—[I was] selling" because "we made pharmacy calls and sold directly to the pharmacists.  And at that time there were ma and pa pharmacies.

Beverley Rowley, a self-described "medical behavioral scientist," testified that physicians call PSRs "sales reps" and "see them as people who are selling their particular product." (Rowley Dep. at 79:1–9; *see also* Rowley CV, Ex. B40 to Def.'s Mem. Supp.)  One Schering executive described PSRs' work as sales, and also sometimes referred to the health care providers to whom PSRs presented information as "customers,"[9] but stated that he used the verbs *promote* and *sell* "interchangeably" because "[t]hey mean the same thing" and to him there is no "distinction between promoting a product and selling a product" in the pharmaceutical industry. (Granowitz Dep. at 108:1–12.) Kuzinski testified that he considered himself to be selling "[e]ven though the doctor wasn't buying the drug from [him]" because he was "getting [the doctor] to recommend your product versus the competition," and "in [Kuzinski's] mind that was a sale." (Kuzinski Dep. at 29:15–30:3.)

It is also undisputed that both Schering and Plaintiffs use the term "commitment" to describe what they hoped to obtain from a physician during a visit.  Jones testified that "[t]he ultimate goal in pharma is to obtain a verbal commitment," but that he "did not get a verbal commitment" even though he "establish[ed] a strong relationship with the physicians, office staff, and nurses" at a particular health care facility.  (Jones Dep. at 217:12–24.) Harris testified that although it was expected of him, he did not feel comfortable

_____

Now you have all chains; ma and pa's have gone by the wayside.").

[9] Granowitz Dep. at 47:18–48:16 & 86:10–87:2; *see also* Ciaffoni Dep. at 18:10–21:6 (describing various health care professionals to whom PSRs promote Schering products as "customers").

asking physicians for commitments to write prescriptions.  (Harris Dep. at 62:16–63:1.)  He further testified that he considered his job as being "[t]o educate [physicians] and hopefully put [Schering's] products in a favorable light," and while he agreed that "the ultimate goal [was] to influence [physicians] to write more prescriptions for the products," he stated that "[w]e just never knew if that was accomplished" because his job involved

> a theoretical promotion.  The people that bought the drugs were not the people we were talking to.  Those were the consumers.  We were talking to physicians, and physicians made prescribing decisions based on a great deal of data, including peer information, journal information, [and] publications of a medical nature.

(Harris Dep. at 20:24–21:18.)

Nonetheless, notwithstanding the industry terminology used by Plaintiffs and their employer, it is also undisputed that during their visits with physicians Schering's PSRs do not enter into contracts with physicians over the price or quantity of Schering's products, obtain their orders for Schering's products, or get binding commitments from the physicians to purchase or prescribe Schering's products.  Each Plaintiff declared:

> I did not enter into contracts or obtain binding commitments from physicians that they would prescribe Schering products in the future. Moreover, I did not receive any guarantee from the doctor that they would prescribe the products to patients in the future. . . . Schering told [PSRs] to ask for a 'commitment' from a physician to prescribe Schering products; nevertheless, even if the physician did give a commitment, it was not binding. . . . Physicians were free to do as they chose and they would frequently end up not prescribing the products.

(Kuzinski 1st Decl. [Doc. # 96] at ¶ 10; Campano 1st Decl. [Doc. # 94] at ¶ 10; Harris 1st Decl., Ex. C to DiChiara 2d Decl. [Doc. # 103], at ¶ 10; Jones 1st Decl. [Doc. # 95] at ¶ 9.)

Plaintiffs' descriptions of the non-binding nature of these commitments comports with Schering executives' descriptions of PSRs' work. One of Defendant's Vice Presidents testified that PSRs "do not enter into contract discussions" under any circumstances. (Granowtiz Dep. at 44:18–22.) They do not negotiate contracts or product pricing with physicians, or give them pharmaceutical products in exchange for money or other consideration. Physicians do not order drugs through PSRs, and in fact do not order products from anyone at Schering even in the "emergency situations" described above. PSRs do not ever exchange money for these products. As Abrahamsen explained:

> Q.     . . . Now, we may debate the semantics of the question but the pharmaceutical reps don't sell anything directly to the physicians, correct?
>
> . . .
>
> A.     Do you mean do the representatives dispense the product at the point of sale to the physicians, is that what you are referring to?
>
> Q.     Yes.
>
> A.     No, they do not dispense, they do not carry the products in their bag to sell directly to physicians.
>
> Q.     So, the sales information that, your department uses to determine targeting and alignments and field force sizing, that is based on sales that occur at the pharmacies, correct?
>
> A.     Yes, sales adjudicated at the pharmacies, yes.

(Abrahamsen Dep. at 68:15–69:21.) Each Plaintiff described his job duties in a manner similar to Abrahamsen. Each declared:

> Throughout my employment with Schering, I never sold any Schering products or services to physicians, drug wholesalers, retail pharmacies, or anyone else. I never took orders for Schering products or services. I never negotiated prices for Schering products or services. I never collected money

12

for Schering products or services.  I never formed contracts for Schering products or services.  The physicians to whom I provided information about Schering products did not purchase Schering products through me, nor did these physicians purchase these products for their patients.  I did not promote Schering products directly to patients or end-users.  My job duties at Schering did not include meeting, communicating, or interacting with, or gathering information about, Schering's wholesale and retail customers in any way.

(Kuzinski 1st Decl. [Doc. # 96] at ¶ 8; Campano 1st Decl. [Doc. # 94] at ¶ 8; Harris 1st Decl., Ex. C to DiChiara 2d Decl., at ¶ 8; Jones 1st Decl. [Doc. # 95] at ¶ 7.)

Rowley's testimony was consistent with Plaintiffs' declarations and the Schering executives' testimony.  She testified that there is no "money exchanged between a physician and a sales rep" and that having reviewed Schering's training materials, she could confirm that Schering does not train its PSRs to "negotiate prices for their pharmaceutical products" or "enter into contracts with physicians" or take "orders" from physicians in the form "a physician wants X amount of a particular product."  (Rowley Dep. at 77:13–22 & 100:9–101:5.)  Nor, according to Rowley, was this surprising.  She stated that not only is it unlawful for a physician to purchase pharmaceutical products from its PSRs, but due to their ethical obligation to "prescribe a product" only if it is in "the best interests of their patients," physicians can make only non-binding commitments to a PSR to prescribe a particular product. (Rowley Dep. at 46:25–47:4 & 98:7–20.)  At oral argument Schering conceded "that [PSRs] do not participate in transferring product from Schering Corp[.] to the distributors or to wholesalers or to retail locations" or to any other entity, and in fact "they're prohibited by law from doing so."  (Oral Arg. Tr. at 6:9–16.)

13

II.     **Summary Judgment**

Summary judgment is appropriate where the record after discovery "show[s] that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).  An issue of fact is "material" if it "might affect the outcome of the suit under the governing law," and is "genuine" if it could lead "a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  In moving for summary judgment against a party who will bear the ultimate burden of proof at trial, the movant "need not prove a negative," but "need only point to an absence of proof on plaintiff's part, and, at that point, plaintiff must 'designate specific facts showing that there is a genuine issue for trial.'" *Parker v. Sony Pictures Entm't, Inc.*, 260 F.3d 100, 111 (2d Cir. 2001) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986)).  If the record as a whole, viewed in the light most favorable to the non-moving party, "could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial," and summary judgment should follow. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986) (quotation marks omitted).

III.    **The FLSA Outside Sales Exemption**

A.      *Legal Principles*

This Court analyzed the outside sales exemption to employers' obligation under the FLSA to pay overtime wages to their employees in the context of PSRs employed by pharmaceutical companies in *Ruggeri v. Boehringer Ingelheim Pharmaceuticals, Inc.*, 585 F. Supp. 2d 254 (D. Conn. 2008) ("*Ruggeri I*") (denying summary judgment to pharmaceutical company on outside sales and administrative exemptions, and granting summary judgment to plaintiffs as to outside sales exemption) and *Ruggeri v. Boehringer*

*Ingelheim Pharmaceuticals, Inc.*, 585 F. Supp. 2d 308 (D. Conn. 2008) ("*Ruggeri II*") (denying Defendant's motion for interlocutory appeal of ruling as to outside sales exemption).

First, the Court observed that "[e]xemptions to the FLSA's overtime requirement are to be 'narrowly construed against the employers seeking to assert them and their application limited to those establishments *plainly and unmistakably* within their terms and spirit.'" *Ruggeri I*, 585 F. Supp. 2d at 261 (quoting *Bilyou v. Dutchess Beer Distribs., Inc.*, 300 F.3d 217, 222 (2d Cir. 2002) (quoting *Arnold v. Ben Kanowsky, Inc.*, 361 U.S. 388, 392 (1960))) (emphasis added in *Ruggeri I*).

*Ruggeri I* then concluded that application of the outside sales exemption to exempt employees from overtime pay required that the employees consummate sales or obtain contracts or orders.  It explained:

> Employers are granted an exemption from the FLSA requirement that they pay overtime to "any employee employed . . . in the capacity of outside salesman," with "such terms [to be] defined and delimited from time to time by regulations[.]" 29 U.S.C. § 213(a)(1).  The FLSA defines the words "sale" or "sell" to "include[] any sale, exchange, contract to sell, consignment for sale, shipment for sale, or other disposition," § 203(k), and regulations promulgated by the Department of Labor ("DOL")[10] specify that this includes "the transfer of title to tangible property, and in certain cases, of tangible and valuable evidences of intangible property," 29 C.F.R. § 541.501(b).  Under DOL regulations, the outside sales exemption applies to
>
> > any employee: (1) Whose primary duty is: (i) making sales within the meaning of section [203(k)], *or* (ii) obtaining orders or contracts for services or for the use of facilities for which a consideration will be paid by the client or customer; *and* (2) Who is customarily and

---

[10] The Department of Labor's regulations "have the force of law," and "are to be given controlling weight unless they are found to be arbitrary, capricious, or manifestly contrary" to the FLSA.  *Freeman v. Nat'l Broad. Co., Inc.*, 80 F.3d 78, 82 (2d Cir. 1996).

> regularly engaged away from the employer's place or places of
> business in performing such primary duty.

29 C.F.R. § 541.500(a) (paragraph breaks omitted).  The regulation itself thus
dictates that if employees do not make any sales and do not obtain any orders
or contracts, then they cannot fit within the outside sales exemption, because
such work must be their "primary duty."  *See also* 29 C.F.R. § 541.503(a)
(Even though promotional work can be considered exempt sales work,
"promotional work that is incidental to sales made, or to be made, *by
someone else* is not exempt outside sales work") (emphasis added).  If the
employees make at least some sales or obtain at least some orders or
contracts, then the outside sales exemption *may* apply, provided that such
work constitutes the employees' "primary duty."

DOL regulations clarify what it means for an employee's work to be her
"primary duty": such work must be "the principal, main, major or most
important duty that the employee performs."  § 541.700(a).  While "[t]he
amount of time spent performing exempt work can be a useful guide in
determining whether exempt work is the primary duty of an employee,"
§ 541.700(b), the "[d]etermination of an employee's primary duty must be
based on all the facts in a particular case, with the major emphasis on the
character of the employee's job as a whole," § 541.700(a).

In addition, when determining what work performed by employees is exempt
outside sales, all work that is "incidental to and in conjunction with the
employee's own outside sales or solicitations" as well as "work that furthers
the employee's sales efforts" must also be considered exempt outside sales.
§ 541.500(b).  At this point in the inquiry, an employer seeking to establish
that its employee's primary duty is exempt outside sales work may
demonstrate that her other work is "incidental to and in conjunction with"
her sales work by pointing to the indicia of sales surrounding that other
work.  This indicia-of-sales inquiry, however, is limited to circumstances
where the employee actually makes sales, and the question is whether her
consummation of sales, plus her work "incidental to and in conjunction
with" such consummation, is sufficient to deem sales her "primary duty."
*See, e.g.*, *Ackerman v. Coca-Cola Enters., Inc.*, 179 F.3d 1260, 1265 (10th Cir.
1999) ("[I]f the employee in question does not actually consummate the sale

at the location in question, then his other activities, even if closely related to sales, are not 'incidental to and in conjunction with' those sales under the regulations.").

*Ruggeri I*, 585 F. Supp. 2d at 261–62 (alterations in *Ruggeri I*); *see also Ruggeri II*, 585 F. Supp. 2d at 311–19.

B.    *Discussion*

Based on this view of the outside sales exemption's contours described above, the Court held that Boehringer's PSRs did not fit within the outside sales exemption because they did not "make sales or obtain contracts or orders," as required under the regulations. *Id.* at 272; *accord Smith v. Johnson & Johnson*, No. 06-4787 (JLL), 2008 WL 5427802, *4–*7, 2005 U.S. Dist. LEXIS 104952, *11–*21 (D.N.J. Dec. 30, 2008) (citing *Ruggeri I* and *Ruggeri II* and holding that a PSR is not an outside salesperson under the FLSA); *id.,* 2008 WL 5427802, *7, 2005 U.S. Dist. LEXIS 104952, *21 (explaining that it "does not find that the regulations necessarily require consummation of a sale in the traditional sense of a signed order for delivery of services or goods.  But the regulations do require more than nonbinding declarations of intent to prescribe in response to promotional inducements of the kind offered by [the PSR] in this case.").

The same conclusion the Court reached in *Ruggeri* as to Boehringer's PSRs applies here given the material similarities between the duties performed by Schering's PSRs and Boehringer's PSRs.  Like Schering's PSRs, Boehringer's PSRs make visits to physicians that "do not culminate in physicians entering into contracts to write a particular number of prescriptions, as PSRs are forbidden by Boehringer from negotiating such contracts." *Ruggeri I*, 585 F. Supp. 2d at 260.  Like Schering's PSRs, Boehringer's PSRs "do not sell

17

Boehringer's products in question directly to patients, as it is unlawful to dispense them without a physician's prescription." *Id.*

Moreover, Defendant presents arguments that echo those which this Court rejected in *Ruggeri*. Schering argues that "[t]he physician is an indispensable party to the sale of prescription pharmaceuticals given the mandatory regulations applicable to the pharmaceutical industry. Such regulations make the transaction no less of a sales transaction; it is what a sale looks like in this highly regulated industry." (Def.'s Mem. Supp. at 5.) As this Court explained in *Ruggeri I*, this argument is unavailing:

> The justification for the pharmaceutical industry's use of PSRs and direction of their efforts at physicians based on the artifact of medical and drug regulation pointed out by Defendant does not provide justification for applying the outside sales exemption to Plaintiffs, especially given that FLSA exemptions apply only to those employees who are "plainly and unmistakably within" them. *Bilyou*, 300 F.3d at 222.

*Ruggeri I*, 585 F. Supp. 2d at 267.

Defendant also argues that employees can be held to fall within the outside sales exemption on the strength of an indicia-of-sales analysis (styled a "'totality-of-the-circumstances' analysis") even where they do not actually consummate sales or obtain orders or contracts. (*See, e.g.*, Def.'s Mem. Supp. at 4.) This Court rejected that construction of the exemption as contrary to the text of the regulations themselves, which expressly state that employees who do not "mak[e] sales or obtain[] orders or contracts" cannot fall within the outside sales exemption. *Ruggeri I*, 585 F. Supp. 2d at 267–68 & n.6; *Ruggeri II*, 585 F. Supp. 2d at 311–19.

Because Schering's PSRs do not make sales or obtain orders or contracts, the outside sales exemption is inapplicable to them. Recent cases on which Defendant relies do not

persuade this Court that either its construction of the outside sales exemption or its conclusion that Schering's PSRs fall outside that exemption was in error.

In *In re Novartis Wage and Hour Litig.*, 593 F. Supp. 2d 637 (S.D.N.Y. 2009), which determined that PSRs fall within the FLSA's outside sales exemption, the court concluded that the "rationale behind the outside sales exemption" is to exclude from the FLSA's overtime protections employees who "(1) generate commissions for themselves through their work and (2) work with minimal supervision, making adherence to an hours-based compensation scheme impractical," rather than employees who "'sell,' as that term is technically defined." *Id.* at 648–49 (discussing *Jewel Tea Co. v. Williams*, 118 F.2d 202, 207–08 (10th Cir. 1941)). Rejecting the plaintiffs' argument that PSRs promoted but did not "sell" pharmaceutical products to physicians,[11] the court explained that it

> cannot ignore reality. Distributors are not the end-users of NPC's products. If physicians did not prescribe NPC products, patients would be unable to buy them and distributors would have no incentive to make purchases from NPC. The purchase cycle commences with a prescription from physicians, who are therefore the appropriate target of the [PSRs'] sales efforts. When the physician writes a prescription for the NPC product, then a sale can take place. Without prescriptions, patients cannot buy the drugs and there is no sale.

*Id.* at 650–51.

---

[11] As here, the defendant pharmaceutical company Novartis Pharmaceuticals Corporation ("NPC") employed PSRs to promote its products to physicians whom it had targeted; the PSRs' promotional activities included the delivery of "a 'core message' about NPC products to each physician they visit" as well as sample products, but because "[u]nder applicable FDA regulations, [PSRs] are barred from selling NPC drugs directly to physicians," PSRs instead seek to "persuad[e] physicians to write prescriptions that are ultimately used by patients in order to obtain NPC products from a pharmacy." *In re Novartis*, 593 F. Supp. 2d at 642–43.

The court further examined the ways in which statutory and regulatory restrictions affect pharmaceutical companies' sales practices.  Observing that "[t]he FDA regulates the pharmaceutical industry in myriad ways, controlling, among other things, how drugs may be researched, manufactured, labeled, sold, distributed, and prescribed," the court explained that while "physicians have an ethical obligation to prescribe only drugs suitable for their patients' medical needs," which precludes them from entering into binding commitments with PSRs, "the physicians called upon by [PSRs] ultimately control the purchase of NPC products by writing prescriptions."  *Id.* at 650.  It concluded that "[g]iven the FDA's regiment controlling how drugs are sold and delivered to patients, it is clear that [PSRs] do not pave the way for sales that will be made by others," but rather that they make their own sales.  *Id.* at 652.  It held:

> [R]ecognizing the realities of the pharmaceutical industry is not incompatible with engaging in a narrow reading.  To the contrary, it produces results that reflect the exemption's terms and spirit.  [PSRs] make sales by obtaining commitments to prescribe NPC drugs from physicians.  They are credited with those sales and compensated accordingly by means of incentive payments. They also work free of direct supervision.  As such, . . . they qualify as exempt outside salespersons.

*Id.* at 653.  This conclusion, it explained, comports with application of the exemption because given PSRs' job duties, "the logical conclusion" is that "[PSRs] make sales in the sense that sales are made in the pharmaceutical industry."  *Id.* at 650.

In reaching its conclusion that PSRs fall within the exemption, the *In re Novartis* court distinguished the case of non-exempt employees who "promoted magazine subscriptions by going door-to-door and persuading customers to fill out a non-binding order card," pursuant to which managers would call on those customers and persuade them to subscribe.  *Id.* at 653 (discussing *Wirtz v. Keystone Readers Serv., Inc.*, 418 F.2d 249, 252

(5th Cir. 1969)).  Unlike that case, it held, "there are no other [Novartis] employees who consummate sales whose foundations were laid by the [PSRs]," and the PSRs are credited with any prescriptions written for Novartis drugs "[t]o the extent the[] physicians [called on by PSRs] write prescriptions for [Novartis] drugs." *Id.* at 653.

This Court finds the analysis underpinning *In re Novartis* unpersuasive for the following reasons.  The regulations governing the outside sales exemption not only require an exempt employee to make sales, but also define what a "sale" is.  And the act of making a "sale," as that term is defined by the FLSA and DOL regulations, is a prerequisite to falling within the outside sales exemption.  *See Clements v. Serco*, 530 F.3d 1224, 1227 (10th Cir. 2008) (civilian military recruiters employed by company in contract with U.S. Army are not within the outside salesperson exemption where they "engaged in sales training and 'sold' the idea of joining the Army to potential recruits [because they] did not engage in sales work as defined by the Department of Labor regulations.").  The Second Circuit has observed that "[g]iven the broad scope of the FLSA and its implementing regulations," the DOL's "regulations provide only general guidance to accommodate the varying needs of employers and employees in a diverse and varied national economy."  *Havey v. Homebound Mortgage, Inc.*, 547 F.3d 158, 163 (2d Cir. 2008) (citing *Acs v. Detroit Edison Co.*, 444 F.3d 763, 770 (6th Cir. 2006)).  That observation, however, does not mean that an exemption to an employer's obligation to pay overtime under the FLSA can apply more broadly than "[t]he regulations specify."  *Id.*; *see also id.* at 163–64 (describing the contours of the administrative exemption by reference to the text of the DOL's regulations following this observation about their "scope" and "general guidance"); *Amendola*, 558 F. Supp. 2d at 470 ("As a starting point, the interpretation of the [FLSA outside sales] exemption rests on the plain meaning of the

statutory and regulatory texts that define it."). This is especially so in light of the requirement that exemptions from the FLSA's overtime requirement be "'narrowly construed against the employers seeking to assert them and their application limited to those establishments plainly and unmistakably within their terms and spirit,'" with "[t]he burden of invoking these exemptions rest[ing] upon the employer." *Bilyou v. Dutchess Beer Distribs., Inc.*, 300 F.3d 217, 222 (2d Cir. 2002) (quoting *Arnold v. Ben Kanowsky, Inc.*, 361 U.S. 388, 392 (1960)) (emphasis added); *see also Havey*, 547 F.3d at 163 (repeating employer's burden and rule of narrow construction of FLSA exemptions) (quoting *Martin v. Malcolm Pirnie, Inc.*, 949 F.2d 611, 614 (2d Cir. 1991)). Therefore, while the "reality" may be that "[d]istributors are not the end-users of [pharmaceutical companies'] products,"[12] that fact is irrelevant to the dispositive inquiry of whether PSRs "mak[e] sales" of those products as defined in the FLSA.

Under the FLSA, the term "'[s]ale' or 'sell' includes any sale, exchange, contract to sell, consignment for sale, shipment for sale, or other disposition," 29 U.S.C. § 203(k), and also "include[s] the transfer of title to tangible property, and in certain cases, of tangible and valuable evidences of intangible property," 29 C.F.R. § 541.501(b). Schering's PSRs do not make, or engage in, any of these things. PSRs do not consummate or make any "sales" of pharmaceuticals to the physicians they visit. PSRs do not "exchange" with physicians for any drugs; they do not make any "contract[s] to sell" drugs to physicians; they do not make any "consignment[s] for sale" with physicians;[13] they do not make any "shipment[s] for sale" to

---

[12] *In re Novartis*, 593 F. Supp. 2d at 650.

[13] That is, PSRs do not "commit," "dedicate," "deliver," "transfer," "give" or "hand over possession" drugs into the physicians' "custody," or "entrust" drugs to physicians, for a later sale. *See* BLACK'S LAW DICTIONARY 327 (8th ed. 2004) (defining "consign" and

physicians; and they do not make any "other disposition" of drugs with physicians.[14]  PSRs also do not "transfer [pharmaceuticals] for a price." *Cf.* BLACK'S LAW DICTIONARY 1364 (8th ed. 2004) (defining "sale").

Moreover, PSRs and physicians do not even have the capacity to consummate sales. Schering's PSRs, like Boehringer's PSRs, are barred both by law and by their employer from entering into contracts or binding commitments with physicians for the prescription of their employer's products.  *Cf. Ruggeri I*, 585 F. Supp. 2d at 267–68 (PSRs "do not and cannot make or produce" sales); *accord Smith*, 2008 WL 5427802, *7, 2008 U.S. Dist. LEXIS 104952, *20–*21 ("in no ordinary sense of the word 'consummation' could one of [the PSR's] sales calls end in the consummation of a sale. [The PSR] could only provide useful information to the physician, and could not enter into an agreement regarding prescriptions by the physician.").  And physicians neither have nor exercise the capacity to make binding commitments to purchase or prescribe pharmaceuticals promoted by Schering's PSRs. DeFeo testified that physicians never order pharmaceuticals directly from Schering even in potential "emergency" situations, when they would obtain them directly through a "group

──────────

"consignment"); WEBSTER'S II DICTIONARY 157 (3d ed. 2005) (same).

[14] Plaintiffs did not "transfer[] something to [a physician's] care or possession" including "by deed or will," and they did not engage in the "relinquishment of property" to physicians. *See* BLACK'S LAW DICTIONARY 505 (8th ed. 2004) (defining "disposition"). Given this meaning of "disposition," Defendant's argument that the regulation's catch-all term "other disposition" encompasses in its scope activities such as those performed by Plaintiffs is unavailing. Were the Court to construe the phrase "other disposition" broadly enough to encompass PSRs' visits with physicians (*see* Def.'s Mem. Supp. at 22 (emphasizing phrase); Oral Arg. Tr. at 40:5–41:15 (Schering arguing that the phrase "allow[s] for those instances where there cannot be a direct interaction between the salesman and the purchaser")), it would substantially expand the outside sales exemption, in direct contravention of its mandate to construe the exemption narrowly and within its plain terms.

purchasing organization," and in any event ethical and legal obligations bar physicians from "mak[ing] a binding commitment to a [PSR] to prescribe certain [pharmaceutical] products." *In re Novartis*, 593 F. Supp. 2d at 650; *see also Ruggeri I*, 585 F. Supp. 2d at 268 ("physicians do not have 'the capacity to purchase or place an order for' . . . pharmaceutical products").

The conclusion that PSRs fall within the outside sales exemption from FLSA's overtime provisions on the basis of "the characteristics of the industry in question," *In re Novartis*, 593 F. Supp. 2d at 649, "[n]otwithstanding PSRs' lack of capacity to sell, and physicians' lack of capacity to purchase," *see Ruggeri I*, 585 F. Supp. 2d at 268, appears to be the back-fitting of the FLSA to industry practices which this Court has rejected, *see id.* at 272; *see also Clements*, 530 F.3d at 1227 ("[t]he touchstone for making a sale, under the Federal Regulations, is obtaining a commitment."); *Smith*, 2008 WL 5427802, *7, 2008 U.S. Dist. LEXIS 104952, *19 ("[p]hysicians . . . do indeed present a chokepoint in the sale of pharmaceuticals, but the nature of the prescription system insulates them from being amenable to 'sales' within the definition of the applicable regulation"). *In re Novartis*'s focus on a pharmaceutical product's "purchase cycle," which "commences" with a physician writing a prescription for the product for a patient, *In re Novartis*, 593 F. Supp. 2d at 650–51, and which, in this case, presumably would continue through a patient's filling the prescription at a pharmacy, to the pharmacy's re-ordering the product from a wholesaler, who then places an order for additional product with the "trade organization" and "legal team" operating under Schering's managed markets group, is not what the PSRs do, which excludes it from the relevant inquiry for FLSA purposes.

As DeFeo's testimony and Plaintiffs' declarations illustrate, the closest that Schering's PSRs come to consummating "sales" is increasing the overall demand for its products, such that *non-PSR* Schering employees negotiate and commit to contracts with wholesalers—*not* the physicians to whom Schering's products are promoted.   An employee does not consummate a "sale" for purposes of the FLSA merely by "lay[ing] the groundwork" for another employee to obtain a customer's commitment. *Clements*, 530 F.3d at 1229; 29 C.F.R. § 541.503(a) (even though promotional work can be considered exempt sales work, "promotional work that is incidental to sales made, or to be made, *by someone else* is not exempt outside sales work") (emphasis added).  Here, not only do the PSRs not consummate the sales, but the physicians with whom the PSRs visit are not Schering's customers.  To the extent PSRs lay foundation or groundwork, it is to increase or maintain their employer's market share for the products they promote.  In this sense they pave the way for sales but in no more direct a manner as a pharmaceutical company's direct-to-consumer advertising, which raises demand for that company's products.  Neither of these activities constitutes "sales" under the FLSA.

The Eleventh Circuit's decision in *Gregory v. First Title of America, Inc.* is not to the contrary.  There, the court held that an insurer's "marketing executive" made sales—and thus was an exempt outside salesperson—because "[o]nce an order for title insurance services is obtained [by the plaintiff], the sale is complete."  555 F.3d 1300, 1309 (11th Cir. 2009) (first alteration in original).  The court relied on the fact that the plaintiff "did not collect orders and turn them over to another salesperson," and there was no "evidence of any other intervening sales effort between [the plaintiff] and orders placed with [the employer]," such that "[a]s opposed to conceiving of [the plaintiff] as 'paving the way' for others to

consummate the sale, we view her as acting more as a conduit through which orders for services flowed." *Id.* The critical difference between the work of First Title's marketing executive and Schering's PSRs is obvious: whereas the marketing executive did all of the work necessary to reach an agreement with a customer, PSRs do not even communicate with the entities to which Schering sells its products, let alone negotiate the contracts or process the orders by which its products are sold.

Some courts concluding that PSRs "sell" pharmaceutical products within the meaning of the FLSA have looked to *IMS Health Inc. v. Ayotte*, 550 F.3d 42 (1st Cir. 2008). There, the court was faced with a constitutional challenge to the Prescription Information Law, a New Hampshire statute affecting PSRs' work by preventing the use "'for any commercial purpose'" of information about pharmaceutical prescriptions containing any "'patient-identifiable and prescriber-identifiable data.'" *Id.* at 47 (quoting N.H. Rev. Stat. Ann. § 318:47-f). In the course of lengthy opinions upholding the constitutionality of the law, both the majority and concurrence/dissent described generally the work of PSRs—in the First Circuit's parlance, "detailers"—within the pharmaceutical industry. The majority described each part of the state's evidence that its law "directly advances [its] interest" of "cost containment" as "forg[ing] some part of the causal chain leading from transfers of prescribers' histories for use in detailing to higher drug prices," *id.* at 55, and stated: "[d]etailing works: that it succeeds in inducing physicians to prescribe larger quantities of brand-name drugs seems clear (even if the exact magnitude of that effect is not)," *id.* at 56. In an opinion concurring and dissenting, one member of the panel used the word "sales" in describing the efficacy of PSRs' efforts: "Detailing is the face-to-face advocacy of a product by sales representatives who visit doctors' offices and hospitals to meet with the prescribing

health care professionals.  Although the objective of these visits is to make sales, detailers often provide valuable information about the drugs they are selling."  *Id.* at 71 (Lipez, J., concurring and dissenting).

The question of "sales" of pharmaceuticals, whether under the FLSA or any other law, was not before the First Circuit, and neither the majority nor the concurrence/dissent in that case makes any reference to the FLSA.  The focus of that court's factual inquiry was on an issue unrelated to the FLSA outside sales exemption—that is, on the efficacy in reducing health care costs of barring pharmaceutical companies and PSRs from using particular data to target physicians, rather than on whether the activities in which PSRs engage constitute "sales."  Therefore, both the use of the term "sales" in the factual section of the concurrence/dissent, and the majority's observation that PSRs' effort "works" in increasing their companies' market shares for a given product, are simply irrelevant to disposition of Defendant's motion.  The factual record before this Court as to whether Schering's PSRs make "sales" is undisputed, and the *IMS Health* opinions do not address or advance the analysis of whether PSRs are engaged in or consummate "sales" as defined in 29 U.S.C. § 203(k) and 29 C.F.R. § 541.501(b).

Defendant also points to *Medtronic, Inc. v. Gibbons*, 527 F. Supp. 1085 (D. Minn. 1981) for its description of the work that cardiac pacemaker manufacturers' "sales representatives" do in promoting their employers' products.  *Medtronic* held that the plaintiff pacemaker manufacturer was entitled to a preliminary injunction preventing its former employee Gibbons from violating a restrictive covenant in an employment contract "by attempting to divert any business from Medtronic by soliciting, contacting, or communicating with any customers for the Medtronic's products."  *Id.* at 1095.  The

*Medtronic* court explained that while Medtronic sold pacemakers to hospitals, hospitals opted to buy these products "on recommendations from a physician or other medical personnel treating a patient" to whom sales representatives promoted the pacemakers. *Id.* at 1094 n.3. The court went on to explain that because "a contractual provision['s] . . . language will be construed most strongly against the drafter" (here, Medtronic), *id.*, "[t]he term customers shall be deemed to include hospitals, physicians, surgeons, or other hospital personnel directly involved in deciding which pacemaker to recommend for purchase," *id.* at 1095. While some courts have found *Medtronic*'s description of pacemaker sales instructive in applying the FLSA outside sales exemption,[15] the issue in *Medtronic* was unrelated to the FLSA outside sales exemption. Moreover, that court construed the term "customer" in line with the applicable rule of contract construction rather than the statutory and regulatory definitions of the term "sale" and narrow construction of the exemption mandated under the FLSA. This Court is therefore unpersuaded that *Medtronic* carries any relevance to the issue regarding the FLSA outside sales exemption.[16]

---

[15] *See, e.g.*, *In re Novartis*, 593 F. Supp. 2d at 649–50; *see also Yacoubian* and *Delgado*, slip ops. at 8–9. The Court discusses below these two cases from the Central District of California.

[16] Defendant's reliance on *Guidant Sales Corp. v. George*, No. Civ. 01-1638(MJD/JGL), 2001 WL 1491317, 2001 U.S. Dist. LEXIS 25538 (D. Minn. Nov. 19, 2001) is unavailing for the same reasons as is *Medtronic*. The *Guidant Sales* court decided a question almost identical to that at issue in *Medtronic*, and granted a preliminary injunction to a cardiac rhythm management device company preventing George, its former employee, from "directly or indirectly selling, soliciting the sale of, supporting the sale or implantation or other use of, or otherwise having any involvement whatsoever with the sale, manufacturing, research and development, marketing or other business aspect of" products similar to the Guidant products he once promoted. *Guidant Sales*, 2001 WL 1491317, 2001, *8, U.S. Dist. LEXIS 25538, *23.

Defendant's reliance on *Palmieri v. Nynex Long Distance Co.*, No. Civ. 04-138-PS, 2005 WL 767170, 2005 U.S. Dist. LEXIS 6057 (D. Me. Mar. 28, 2005), *aff'd*, 437 F.3d 111 (1st Cir. 2006), is also unavailing.  There, the First Circuit did not address that plaintiff's argument as to the federal outside sales exemption.  *Palmieri*, 437 F.3d at 113 ("In this appeal, Palmieri contests only the district court's resolution of his claim for overtime pay under Maine law.").  Moreover, at the district court Palmieri—a Corporate Account Manager expected to sell products and services on Verizon's high-speed voice and data networks to large customers, and to handle those customers' complaints, *see* 437 F.3d at 112—did not dispute that he made *some* sales, and instead argued that under an indicia-of-sales analysis making sales was not his primary duty.  *See* 2005 WL 767170, *12–*15; 2005 U.S. Dist. LEXIS 6057, *42–*53.  Because Schering's PSRs make or consummate no sales at all, the indicia-of-sales analysis is inapplicable, and therefore *Palmieri* is inapplicable.

Finally, Defendant also relies on seven cases from the Central District of California holding that PSRs fall within the outside salesperson exemption to California's state-law overtime laws.  *Ruggeri I* and *Ruggeri II* provide lengthy explanations for this Court's rejection of four of these cases.[17]  *See Ruggeri I*, 585 F. Supp. 2d at 268–71; *Ruggeri II*, 585 F. Supp. 2d at 312–17; *accord Smith*, 2008 WL 5427802, *6, 2008 U.S. Dist. LEXIS 104952, *16–*18; *Amendola v. Bristol-Myers Squibb Co.*, 558 F. Supp. 2d 459, 470, 472 (S.D.N.Y. 2008) (rejecting these cases because they "do not acknowledge that the FLSA's exemptions must be narrowly construed against employers, or address the governing principles of

---

[17] *See Brody v. AstraZeneca Pharmaceuticals, LP*, No. CV 06-06862 ABC (MANx), slip op. (C.D. Cal. June 11, 2008); *Menes v. Roche Labs, Inc.*, No. 2:07-cv-01444-ER-FFMx, 2008 U.S. Dist. LEXIS 4230 (C.D. Cal. Jan. 7, 2008); *Barnick v. Wyeth*, 522 F. Supp. 2d 1257 (C.D. Cal. 2007); *D'Este v. Bayer Corp.*, No. CV 07-3206-JFW (PLAx), 2007 U.S. Dist. LEXIS 87229 (C.D. Cal. Oct. 9, 2007).

statutory construction in grappling with the plain meaning of the regulatory term 'sales.'"). The fifth case, *Rivera v. Schering Corp.*, No. CV 08-1743-GW(JCx), slip op. (C.D. Cal. Aug. 14, 2008),[18] is unavailing in light of the fact that its one-paragraph discussion of the outside salesperson exemption relies exclusively on these four cases, provides no independent analysis, and limits its holding to California law. *See Rivera* slip op. at 3–4 & 4 n.3 ("Four different judges within this District have decided this question within the last year, and all have reached the conclusion that individuals in functionally the exact same employment as Plaintiff fit within the 'outside salespersons' exemption recognized by California's Labor Code and the relevant IWC Wage Order").

The final two cases, issued by the same court on the same day and containing verbatim the same analysis of the FLSA outside sales exemption, conclude that although "[r]egulations and ethics preclude physicians from ever making a binding commitment to a [PSR] to prescribe a certain drug," they "directly control which, and how much, of any medication is purchased by patients," so it is physicians—"the lynchpins" of "the drug-company-to-patient supply or distribution chain"—whose decisions drive the patient demand, which in turn drives a pharmaceutical company's sales to wholesalers, such that PSRs' dealings with physicians should be considered sales under the regulations. *Yacoubian v. Ortho-McNeil Pharmaceutical Corp.*, No. SACV 07-127-CJC (MLGx), slip op. at 5–11 (C. D. Cal. Feb. 6, 2009); *Delgado v. Ortho-McNeil Primary Care, Inc.*, No. SACV-07-263-CJC (MLGx), slip op. at 5–11 (C.D. Cal. Feb. 6, 2009).[19] This Court declines to follow *Yacoubian*

---

[18] *Rivera* is unavailable on either Westlaw or Lexis, but Defendant appended a copy to its motion.  (Ex. A to Def.'s Not. Suppl. Auth. [Doc. # 109].)

[19] *Yacoubian* and *Delgado* are unavailable on either Westlaw or Lexis, but Defendant appended copies to its motion.  (Exs. A & B to Def.'s Not. Suppl. Auth. [Doc. # 128].)

and *Delgado* because of what it sees as their misplaced reliance on *IMS Health* and *In re Novartis* as well as *Jewel Tea Co.*'s generic description of the outside sales exemption and *Medtronic*'s construction of an employment contract.

It is the clarity of the statutory and regulatory language at issue defining the conduct and activity which constitutes "selling" or making a "sale" which undermines Schering's use of the term "sales" to classify PSRs' work as exempt from FLSA's overtime pay provisions[20] and which renders unpersuasive other cases' characterizations of PSRs' work.[21]  Because PSRs undisputedly do not "sell" or make any "sales" as those terms are defined in the FLSA and its implementing regulations, they fall outside the FLSA's outside sales exemption.

---

[20] It is the FLSA statute and regulations, applied to the record before the Court, which determines that  whether that PSRs fall outside the outside sales exemption. Therefore, Defendant's suggestion that the Court should find Plaintiffs exempt because "[p]harmaceutical companies across the country are facing an epidemic . . . characterized by a rash of lawsuits that threatens the way the pharmaceutical industry has conducted business for decades" resulting from "an aggressive advertising campaign launched by Plaintiffs' counsel on the Internet to drum up plaintiffs" (Def.'s Mem. Supp. at 2–3) is irrelevant.

[21] To hold PSRs within the outside sales exemption on the basis of glosses on the effect of their promotional activities in marketing Schering's prescription pharmaceutical products would unduly expand the plain meaning of the terms "sell" and "sale" under the FLSA and its implementing regulations.

**IV.      Conclusion**

For the reasons set forth above, Defendant's Motion for Summary Judgment [Doc. # 85] is DENIED.

IT IS SO ORDERED.


_____/s/_____
Janet Bond Arterton, U.S.D.J.


Dated at New Haven, Connecticut this 30th day of March, 2009.