UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| Eugene Kuzinski, *et al.*,<br>    *Plaintiffs*,<br><br>        *v.*<br><br>Schering Corporation,<br>    *Defendant.* | Civil No. 3:07cv233 (JBA)<br><br><br><br>August 5, 2011 |

RULING ON MOTIONS FOR SUMMARY JUDGMENT

On May 8, 2007, Plaintiffs Eugene Kuzinski, Marc Campano, Jerry Harris, and Shawn Jones filed an Amended Complaint against Defendant Schering Corporation ("Schering") on behalf of themselves and other Schering Pharmaceutical Sales Representatives alleging that Schering misclassified them as exempt from the overtime provisions of the Fair Labor Standards Act ("FLSA"), 29 U.S.C. §§ 201 *et seq.* Schering previously moved for summary judgment on the ground that Plaintiffs were exempt from the overtime provisions of the FLSA under the "outside sales exemption," which the Court denied. The Second Circuit affirmed the Court's denial of summary judgment. Schering now moves [Doc. # 171] for summary judgment on the "administrative exemption," arguing that it is entitled to summary judgment in its favor on each of Plaintiffs' claims because they are exempt under the FLSA. Plaintiffs also move [Doc. # 174] for summary judgment on the administrative exemption, requesting a declaration that they and others similarly situated are not exempt from the overtime provisions of the FLSA pursuant to the administrative exemption. For the reasons stated below, Schering's motion for summary judgment will be denied, and Plaintiff's motion for summary judgment will be granted.

I.  Relevant Undisputed Facts

Facts relevant to Plaintiffs' roles as Pharmaceutical Sales Representatives ("PSRs") are set out in the Court's prior ruling denying Schering's motion for summary judgment on the outside sales exemption. *See Kuzinski v. Schering Corp.*, 604 F. Supp. 2d 385, 386–393 (D. Conn. 2009). Schering "manufactures and sells prescription drugs to hospitals, certain managed care organizations, wholesale distributors and retail pharmacists," distributing over 90 percent of its products to wholesalers, and the remainder to "governmental entities, hospitals, and directly to chain pharmacies." *Id.* at 386–87. Schering previously employed Plaintiffs as Pharmaceutical Sales Representatives ("PSRs"). *Id.* at 387. PSRs are generally used by Schering to "introduce[] and make[] known its prescription drugs to physicians, pharmacists, hospitals, managed care organizations and buying groups." *Id.*

"To maintain or increase its market share, Schering promotes its products both through the work of PSRs and through direct-to-consumer advertising campaigns. [D]irect-to-consumer campaigns drive expansions in the overall market for a type of pharmaceutical, and its PSRs' efforts 'drive [Schering's] market share' for a given product." *Id.* at 388. Schering expects that its direct–to–consumer campaigns and the work of PSRs "will drive patient demand for its products, and thus will increase its sales." *Id.*

A.  Plaintiffs' Duties and Training

As PSRs, Plaintiffs' primary responsibilities were to meet with physicians selected by Schering within a particular territory defined by Schering and provide information pre–approved by Schering about Schering's pharmaceutical products. (Campano Decl. [Doc. # 178] ¶ 3; Kuzinski Decl. [Doc. # 179] ¶ 3; Harris Decl. [Doc. # 180] ¶ 3; Miller Decl.

[Doc. # 181] ¶ 3; Schnorr–Leavy Decl. [Doc. # 182] ¶ 3; Jones Decl. [Doc. # 183] ¶ 3); *see also Kuzinski*, 604 F. Supp. 2d at 388.

> Each Plaintiff worked away from Schering's offices throughout the day, visiting physicians, taking health care professionals to lunch or dinner at which they would promote Schering's products, and attending after–hours Schering training sessions and conferences with other Schering PSRs. Each Plaintiff reported to a District Manager, who supervised Plaintiff's work and sometimes observed Plaintiff's fieldwork during "ridealongs." PSRs may not "relay any information to a health care provider other than what's been provided to them through training" by Schering, and may present only "preapproved clinical stud[ies]." Schering purchases data about physicians' prescriptions, which it uses to "target" physicians—that is, select the physicians to whom PSRs will promote Schering products-and to track trends in the use of its products.

*Id.* at 388–89.

During calls with health care providers, PSRs are expected, "most of the time," to deliver a "core message." (Granowitz Dep., Ex. A7 to Def.'s 56(a)1 Stmt. at 33:3–12.) They are not, however, expected to deliver the core message on every call and there are cases, particularly in the event of a shorter visit with a physician, "where a discussion with a health care provider will not involve delivering the core message." (*Id.* at 33:3–23.) PSRs are trained in a "suggested format to operate from" in delivering the core message, such that individual discussions with physicians may be different, but "[t]hey can only speak about the product as it pertains to the package insert, what [it is] indicated for, contraindicated for, adverse events, [and] how it's dosed." (Tryba Dep., Ex. E to Pls.' Loc. R. 56(a)1 Stmt. at 22:24–23:19.) PSRs do not develop their own core message; instead marketing teams at Schering develop and test the core message for each product and then train the PSRs on delivering that core message. (*Id.*; Granowitz Dep., Ex. C to Pls.' 56(a)1 Stmt. at 92:15–93:25; Ron Dep., Ex. A to Pls.' 56(a)1 Stmt. at 83:10–84:2.)

As part of their sales–call training, PSRs are also provided with "sample openings" for calls as well as a "menu of questions that sales representatives can ask during a call," from which they are trained to select a few key questions "that are appropriate for the current physician and will allow them to maximize time with the physician based on call objectives and access time historically granted by the physician." (Schering Sales Call Training, Ex. N to Pls.' 56(a)1 Stmt. at 2442–2455.) Schering also provides training on how to respond to commonly asked questions or objections during calls. (*Id.* at 2462–2477; Granowtiz Dep. at 68:7–9; Tryba Dep. at 27:6–21.) As with the openings, Schering also provides PSRs with "sample closings" as part of their sales call training. (Schering Sales Call Training at 2460–2461.) This training provides the foundation of the body of information that PSRs can discuss with health care providers during sales calls. (Granowitz Dep. at 36:3–6.) Although Schering does not require PSRs to deliver a scripted dialogue during sales calls, instead providing sample dialogues during training (*see* Schering Sales Call Training), PSRs are not permitted to communicate any information to health care professionals during sales calls beyond that which was provided in training (Granowitz Dep. at 32:14–20, 36:7–10.) Schering similarly forbids PSRs from discussing off–label uses for Schering products during sales calls. (Dusseaux Dep., Ex. G to Pls.' 56(a)1 Stmt. at 19:22–20:17.)

Schering provides PSRs with visual aids and promotional materials, or "detail pieces," to use during sales calls. (Granowitz Dep. at 36:11–24; Tryba Dep. at 25:19–26:8.) PSRs are not allowed to show health care professionals any promotional materials not received from Schering (Tryba Dep. at 25:19–26:8; Promotional Regulations, Ex. I to Pls.' 56(a)1 Stmt. at 993), however they may add their own slides to promotional presentation slide decks as long

4

as the additional slides are approved by Schering. (U.S. Sales and Marketing Policy Frequently Asked Questions, Ex. L to Pls.' 56(a)1 Stmt.)

The Global Analytics department at Schering creates target lists for the PSRs, consisting of "the highest volume prescribers within each therapeutic class." (Ron Dep. at 96:23–97:4; Abrahamsen Dep., Ex. B to Pls.' 56(a)1 Stmt. at 22:4–23:19.) PSRs are expected to call on the doctors on the target list but "have the flexibility to call on doctors beyond that target list, depending on what makes the best business sense in order to drive their products." (Ron Dep. at 97:5–14.) Schering also conducts market research "to set the strategy for [a] product area," which is conveyed to PSRs in order to inform sales strategies. (Cain Dep., Ex. F to Pls.' 56(a)1 Stmt. at 72:3–73:13.)

B. Sales Calls Performance

Plaintiff Eugene Kuzinski testified during his deposition that his selling skills were "pretty much by the book" in the sense that he received "canned presentations" for meetings with health care professionals. (Kuzinski Dep., Ex. A10 to Def.'s 56(a)1 Stmt. at 42:14–43:9.) Mr. Kuzinski did not, however, "use the same presentation with every doctor he met with," but instead, he adjusted his presentations using information responsive to doctors' questions. (*Id.* at 43:24–44:21.) He similarly agreed during his deposition that he "became good at reading people" through his 26 years of experience and would learn how far to push each doctor on his pitch. (*Id.* at 106:5–17.)

Plaintiff Mark Campano testified that he would vary his sales call presentation based on the type of doctor to whom he was talking; when dealing with a specialist he would include more technical information, whereas with a primary care doctor he would present "more of a layman–type promotion deal." (Campano Dep., Ex. A4 to Defs.' 56(a)1 Stmt. at

5

34:19–35:12.) He would also vary the length of his presentations and his inclusion of clinical studies based on how interested a doctor seemed. (*Id.* at 164:22–165:18; 188:5–89:2.) Plaintiff Gerald Harris would similarly vary his presentation based on the particular doctor's specialty or personality. (Harris Dep., Ex. A8 to Defs.' 56(a)1 Stmt. at 37:19–38:2, 57:11–15.) However, Mr. Harris also explained in his deposition that he was told by Schering to spend more time with some physicians in his territory than with others. (*Id.* at 57:15–21.)

    C.    Salaries

Plaintiff Campano, who last worked for Schering in 2004, had an annual base salary of $71,900 as of March 15, 2004. (Ex. B4 to Defs.' Loc. R. 56(a)1 Stmt.) Plaintiff Harris' lowest annual base salary from January 2004 onwards was $86,100. (Ex. B5 to Defs.' 56(a)1 Stmt.) Plaintiff Kuzinski's lowest annual base salary from January 2004 onward was $83,000. (Ex. B6 to Defs.' 56(a)1 Stmt.) Plaintiff Jones' lowest annual base salary from April 2004 onward was $72,600. (Ex. B7 to Defs.' 56(a)1 Stmt.)

II.    Discussion[1]

The FLSA exempts from its overtime pay requirement "any employee employed in a bona fide executive, administrative, or professional capacity . . . or in the capacity of an outside salesman." 29 U.S.C. § 213(a)(1). To qualify as an administrative employee (1) the

---

[1] "Summary judgment is appropriate where, construing all evidence in the light most favorable to the non-moving party," *Pabon v. Wright*, 459 F.3d 241, 247 (2d Cir. 2006), "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law," Fed. R. Civ. P. 56(c)(2). An issue of fact is "material" if it "might affect the outcome of the suit under the governing law," and is "genuine" if "a reasonable jury could return a verdict for the nonmoving party" based on it. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "Unsupported allegations do not create a material issue of fact." *Weinstock v. Columbia Univ.*, 224 F.3d 33, 41 (2d Cir. 2000).

employee must earn at least $455 a week; (2) the employee's "primary duty" must be "the performance of office or non–manual work directly related to the management or general business operations of the employer or the employer's customers"; and (3) the employee's "primary duty" must include "the exercise of discretion and independent judgment with respect to matters of significance." 29 C.F.R. § 541.200(a). "Because the FLSA is a remedial law, exemptions to the overtime pay requirement are narrowly construed against the employers seeking to assert them and their application limited to those establishments plainly and unmistakably within their terms and spirit." *Mullins v. City of New York*, No. 09–3435–cv, slip op. at 15 (2d Cir. Aug. 5, 2011) *(*citing *In re Novartis Wage and Hour Litig.*, 611 F.3d 141, 150 (2d Cir. 2010)).

A. Salary

To be an exempted administrative employee, an individual must be "[c]ompensated on a salary or fee basis at a rate of not less than $455 per week." 29 C.F.R. § 541.200. Plaintiffs do not dispute that they earned in excess of $455 per week as PSRs and therefore satisfy the first administrative exemption requirement.

B. Work Directly Related to Management or General Business Operations

Plaintiffs argue that they should prevail on their motion for summary judgment under the second prong of the administrative exemption standard because their primary duty, meeting with physicians assigned by Schering to provide Schering–approved product information, is nothing more than targeted marketing for Schering and thus not related to Schering's management or general business operations. Schering argues that Plaintiffs' primary duty is promoting the sale of pharmaceutical products and, by increasing the overall

7

demand for Schering's products, directly relates to Schering's core function, thus satisfying the second prong of the administrative exemption standard.

In order to perform a duty directly related to management or general business operations "an employee must perform work directly related to assisting with the running or servicing of the business, as distinguished, for example, from working on a manufacturing production line or selling a product in a retail or service establishment." 29 C.F.R. § 541.202(a). Such work "includes only activities that are clearly related to servicing the business itself, and without which the business could not function," as opposed to "activities that involve what the day–to–day business specifically sells or provides." *Ruggeri v. Boehringer Ingelheim Pharm.*, 585 F. Supp. 2d 254, 264 (D. Conn. 2008) (internal quotations omitted). "[E]mployees are not administratively exempt if their work involves their employer's day-to-day functioning but does not engage with the broader issues of the employer's 'course or policies.'" *Id.* With respect to employees involved in sales, the distinction between whether or not their work directly relates to management or general business operations turns on whether that employee makes specific sales or promotes sales generally:

> [S]ales promotion 'consists of marketing activity aimed at promoting (i.e., increasing, developing, facilitating, and/or maintaining) customer sales generally.' . . . [A]n employee making specific sales to individual customers is a salesperson for the purposes of the FLSA, while an employee encouraging an increase in sales generally among all customers is an administrative employee for the purposes of the FLSA. Consider a clothing store. The individual who assists customers in finding their size of clothing or who completes the transaction at the cash register is a salesperson under the FLSA, while the individual who designs advertisements for the store or decides when to reduce prices to attract customers is an administrative employee for the purposes of the FLSA.

*Reiseck v. Universal Commc'ns of Miami, Inc.*, 591 F.3d 101, 107 (2d Cir. 2010) (quoting *Martin v. Cooper Elec. Supply Co.*, 940 F.2d 896, 905 (3d Cir. 1991)).

Using the distinction between specific sales and general sales promotion, the Second Circuit held in *Reiseck* that a regional director of sales for a travel magazine, whose primary duty it was to "sell specific advertising space to clients," did not perform a primary duty directly related to management or general business operations. 591 F.3d at 107. The Southern District of New York followed this approach in *Gorey v. Manheim Services Corp.*, --- F. Supp. 2d ----, 2011 WL 1832562, *5–6 (S.D.N.Y. 2011), finding that outside sales representatives for an auctioneer were not exempt administrative employees because their "primary duty is to promote sales to individual customers instead of promoting sales generally." The primary duty of the outside sales representatives in *Gorey* was "to identify and convince specific dealers, in a defined territory, to use Manheim's auction and ancillary services," and therefore they did not "encourag[e] an increase in sales generally among all customers by marketing, servicing, or promoting Manheim's services." *Id.* at *6 (citing *Reiseck*, 591 F.3d at 105–08). The court noted that although the sales representatives had some flexibility in negotiating pricing, they did not "evaluate or set Manheim's general pricing structure to determine its competitiveness in an effort increase sales generally." *Id.* The Southern District of Florida recently used a similar approach specifically with regard to PSRs for Boehringer Ingelheim Pharmaceuticals in *Palacios v. Boehringer Ingelheim Pharmaceuticals, Inc.*, --- F. Supp. 2d ----, 2011 WL 2837464, *7 (S.D. Fla. 2011), finding that where a representative communicated to physicians Boehringer's "carefully scripted core message" and "merely perform[ed] promotional work that aided [advertising, sales operation, and commercial analytics] departments in their duties" but did not perform "any

work in the functional areas of tax, finance, accounting, auditing, advertising, research and development, personnel management, human resources, labor relations, government relations, or information technology," her primary duty was not related to management or general business operations.

Plaintiffs here did not directly sell any product to individual health care providers but helped "drive Schering's market share for a given product" by providing Schering–approved information to physicians within their territory. *Kuzinski*, 604 F. Supp. 2d at 388–89; (Campano Decl. ¶ 3; Kuzinski Decl. ¶ 3; Harris Decl. ¶ 3; Miller Decl. ¶ 3; Schnorr–Leavy Decl. ¶ 3; Jones Decl. ¶ 3.) "[T]he closest that Schering's PSRs come to consummating 'sales' is increasing the overall demand for its products, such that non-PSR Schering employees negotiate and commit to contracts with wholesalers- not the physicians to whom Schering's products are promoted." *Kuzinski*, 604 F. Supp. 2d at 399. However, while PSRs do not "consummate" the sales themselves, neither do they design the promotional materials to be used in their sales calls (Tryba Dep. at 25:19–26:8; Promotional Regulations at 993), nor set the overall market strategy for products (Cain Dep. at 72:3–73:13), nor develop the "core message" to be delivered during meetings with health care professionals (Tryba Dep. at 22:24–23:19; Granowitz Dep. at 92:15–93:25; Ron Dep. at 83:10–84:2.) Thus, to use the clothing store analogy from *Reiseck*, 591 F.3d at 107, the PSRs are neither the employee "who completes the transaction at the cash register" nor the employee "who designs advertisements for the store or decides when to reduce prices to attract customers."

Plaintiffs were instead most similar to the employee in the clothing store "who assists customers in finding their size of clothing." *Id.* Plaintiffs did not directly sell pharmaceutical products, but, much like an employee who roams the floor of a clothing store

10

and adjusts her sales pitch to promote particular products to individual customers, they operate within a set territory and provide Schering–approved information, tailored to individual health care providers, to ultimately drive sales. Plaintiffs did not use the same presentation with every doctor (Kuzinski Dep. at 43:24–44:21; Campano Dep. at 34:19–35:12; Harris Dep. at 37:19–38:2), but Schering permitted them to present only a limited universe of information (Granowitz Dep. at 32:14–20; 36:7–10). Although they helped drive Schering's market share, *Kuzinski*, 604 F. Supp. 2d at 388–89, they did so by promoting products to specific physicians in a set territory, not by marketing Schering products generally. *See Reiseck*, 591 F.3d at 107; *Manheim*, 2011 WL 1832562 at *6. Schering's PSRs use the core messages and promotional strategies developed by marketing teams; they do not develop those messages themselves or set overall market strategies. *See Palacios*, 2011 WL 2837464 at *7. Plaintiffs' targeted promotional work is therefore not a duty directly related to Schering's management or general business operations; their primary duty does not satisfy the second prong of the administrative exemption test under the FLSA.

    C.    Exercise of Discretion and Independent Judgment With Respect to Matters of Significance

To satisfy the third prong of the FLSA's administrative exemption, Plaintiffs' "primary duty" must include "the exercise of discretion and independent judgment with respect to matters of significance." 29 C.F.R. § 541.200(a). Schering argues that Plaintiffs' primary duty satisfies this standard because without substantial oversight "they had the authority, and the responsibility, to perform work affecting business operations to a substantial degree, to provide consultation or expert advice to management, and to engage in planning long–term and short–term objectives for their territory." (Def.'s Mem. Supp.

11

at 22–23.) Plaintiffs argue that their primary duty does not include the exercise of discretion with respect to matters of significance because they have no role in planning Schering's marketing strategy or the core messages delivered to physicians, they are required to visit a given physician a certain number of times and promote a given drug a certain number of times, and they are not allowed to deviate from core messages or answer questions for which they have not been scripted. (Pls.' Mem. Supp. at 18–19.)

The exercise of discretion and independent judgment with respect to matters of significance requires more than just "the use of skill in applying well–established techniques, procedures, or specific standards"; it must involve the "authority to make an independent choice, free from immediate direction or supervision." 29 C.F.R. §§ 541.202(c), (e); *see also Ruggieri*, 585 F. Supp. 2d at 265. "In general, the exercise of discretion and independent judgment involves the comparison and the evaluation of possible courses of conduct, and acting or making a decision after the various possibilities have been considered. The term 'matters of significance' refers to the level of importance or consequence of the work performed." *Id.* § 541.202(a). Factors relevant to determining whether or not an employee exercises discretion and independent judgment include:

> whether the employee has authority to formulate, affect, interpret, or implement management policies or operating practices; whether the employee carries out major assignments in conducting the operations of the business; whether the employee performs work that affects business operations to a substantial degree, even if the employee's assignments are related to operation of a particular segment of the business; whether the employee has authority to commit the employer in matters that have significant financial impact; whether the employee has authority to waive or deviate from established policies and procedures without prior approval; whether the employee has authority to negotiate and bind the company on significant matters; whether the employee provides consultation or expert advice to management; whether the employee is involved in planning long-

or short-term business objectives; whether the employee investigates and resolves matters of significance on behalf of management; and whether the employee represents the company in handling complaints, arbitrating disputes or resolving grievances.

*Id.* § 541.202(b).

In *Novartis*, 611 F.3d at 156–57, the Second Circuit held that PSRs employed by Novartis Pharmaceuticals Corporation did not exercise discretion and independent judgment with respect to matters of significance:

> Comparing the record as to the Reps' primary duties against the illustrative factors set out in § 541.202(b), for example, we see no evidence in the record that the Reps have any authority to formulate, affect, interpret, or implement Novartis's management policies or its operating practices, or that they are involved in planning Novartis's long-term or short-term business objectives, or that they carry out major assignments in conducting the operations of Novartis's business, or that they have any authority to commit Novartis in matters that have significant financial impact.

The Second Circuit based its holding on the undisputed facts that the PSRs had no role in planning Novartis's marketing or the core messages delivered to physicians, were required to "visit a given physician a certain number of times per trimester . . . [and] promote a given drug a certain number of times per trimester as established by Novartis," were required by Novartis to hold at least a certain number of promotional events, were not allowed to deviate from the core messages, and were "forbidden to answer any question for which they ha[d] not been scripted." *Id.* at 157. The *Novartis* PSRs did "not play any part in formulating the core message or the written materials; nor [did] they play any part in devising Novartis's advertising"; they could not use any written materials not provided by Novartis and were expected to check in with their supervising district managers by telephone "at least every week or two" and participate in "ride–alongs" where their managers would observe and

13

critique their sales visit performance. *Id.* at 145. Although Novartis argued that PSRs were "free to decide in what order to visit physicians' offices, free to decide how best to gain access to those offices, free to decide how to allocate their Novartis budgets for promotional events, and free to determine how to allocate their samples," the court held that these freedoms "do not show that the Reps are sufficiently allowed to exercise either discretion or independent judgment in the performance of their primary duties." *Id.*

In contrast, in *Smith v. Johnson & Johnson*, 593 F.3d 280, 285 (3d Cir. 2010), the Third Circuit held that pharmaceutical Senior Professional Sales Representative Patty Lee Smith did exercise discretion and independent judgment with respect to matters of significance where she "executed nearly all of her duties without direct oversight." In "extoll[ing] the benefit of J & J's pharmaceutical drug Concerta" to health care professionals, Smith "was unsupervised 95% of the time" and testified in her deposition: "[i]t was really up to me to run the territory the way I wanted to. And it was not a micromanaged type of job. I had pretty much the ability to work it the way I wanted to work it." *Id.* at 282–83. "Smith was the 'expert' on her own territory and was supposed to develop a strategic plan to achieve higher sales." *Id.* at 283.

The undisputed facts of this case demonstrate that Plaintiffs more closely resemble the PSRs in *Novartis*, who did not exercise discretion and independent judgment with respect to matters of significance, than they do the Senior Professional Sales Representative in *Smith*. Plaintiffs' work ultimately served to drive Schering's market share, and they had the discretion to adjust their interactions with physicians based on what they individually found most effective in order to improve Schering's market position. *Kuzinski*, 604 F. Supp. 2d at 388–89; (Kuzinski Dep. at 43:24–44:21; Campano Dep. at 34:19–35:12; Harris Dep. at

14

37:19–38:2.) They spent most of their time outside the office, managing their individualized approach as they saw fit. *Kuzinski*, 604 F. Supp. 2d at 388. Plaintiffs were not required by Schering to always deliver the same scripted core message to every physician with whom they met, and although they were provided with scripted discussion examples during training, their sales calls were not executed according to a set script. (Granowitz Dep. at 33:3–23; Schering Sales Call Training.) The discretion afforded PSRs did not, however, extend beyond their exercise of these day–to–day duties to "matters of significance."

Like the PSRs in *Novartis*, Plaintiffs reported to District Managers who supervised their work and sometimes observed them in the field. *Kuzinski*, 604 F. Supp. 2d at 388; *compare Novartis*, 611 F.3d at 145, *with Smith*, 593 F.3d at 285. Although they were permitted to adjust their approach with respect to individual physicians, they were not allowed to present any information that had not been approved by and received from Schering. *Id.*; (Granowitz Dep. at 32:14–20; 36:7–10.) They were not allowed to develop their own core message but were instead instructed by Schering on how to deliver a core message that had been developed by a Schering marketing team. (Tryba Dep. at 22:24–23:19; Granowitz Dep. at 92:15–93:25.) Schering set the overall market strategy for particular products, and while Plaintiffs had the ability to call on doctors that were not on the target list generated by Schering, they were required to call on each doctor on that target list. (Cain Dep. at 72:3–73:13; Ron Dep. at 97:5–14.)

Thus, any discretion that Plaintiffs exercised fell within the bounds of the strategic plan and core message developed by Schering, rather than developed by Plaintiffs themselves. *Compare Smith*, 593 F.3d at 283. As with the PSRs in *Novartis*, they had no role in planning market strategy or the core message, were provided with certain health care

15

professionals with whom they were required to meet, and were not allowed to provide any information outside of that supplied by Schering. 611 F.3d at 157. Plaintiffs therefore did not exercise the necessary discretion and independent judgment to be considered administrative employees under the third prong of the administrative exemption test under the FLSA.

III.     Conclusion

For the reasons stated above, Schering's motion [Doc. # 171] for summary judgment on the administrative exemption is DENIED and Plaintiffs' motion [Doc. # 174] on the administrative exemption is GRANTED.

IT IS SO ORDERED.

/s/
Janet Bond Arterton, U.S.D.J.

Dated at New Haven, Connecticut this 5th day of August, 2011.